IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

CROWN CORK & SEAL USA, INC.,

                Plaintiff,

     v.

MIA BEHURST, and
BARRETT BEHURST

           Defendants.

No. 3:10-CV-251-HZ

FINDINGS OF FACT &
CONCLUSIONS OF LAW

/ / /

/ / /

Vicki L. Smith
Parna A. Mehrbani
LANE POWELL PC
601 SW Second Avenue, Suite 2100
Portland, Oregon 97204

     Attorneys for Plaintiff

1 - FINDINGS OF FACT & CONCLUSIONS OF LAW

Daniel Snyder
Erin McCool
LAW OFFICES OF DANIEL SNYDER
1000 S.W. Broadway, Suite 2400
Portland, Oregon 97205

      Attorneys for Defendants

HERNANDEZ, District Judge:

      Plaintiff Crown Cork & Seal USA, Inc. ("Plaintiff" or "Crown Cork") filed this action

(the "Settlement Agreement Action") against Mia Behurst ("Mrs. Behurst") and Barrett Behurst

("Mr. Behurst") (collectively, "Defendants" or the "Behursts").  Plaintiff seeks (1) a declaratory

judgment that a settlement agreement ("Settlement Agreement")[1] signed by the Behursts and

Crown Cork on October 28, 2009, is valid and enforceable; (2) an order preventing Defendants

from taking any action contrary to their obligations under the Settlement Agreement and an order

compelling Mrs. Behurst to comply with her obligations under the Settlement Agreement; and

(3) a claim for breach of contract.  Defendants filed an Answer seeking rescission of the

Settlement Agreement on the bases it was signed under duress and undue influence.  Answer  7,

9, 37.

### INTRODUCTION AND PROCEDURAL BACKGROUND

      This proceeding stems from another action (the "Wrongful Death Action") filed on

August 10, 2004, by Mrs. Behurst against Crown Cork & Seal USA, Inc. ("Plaintiff" or "Crown

Cork") and Ameco Corp. ("Ameco") for the wrongful death of Mrs. Behurst's daughter, Tara

---

[1] Pursuant to the Settlement Agreement, Mrs. Behurst was to receive $750,000 if the jury's verdict was less than $750,000 or if the trial resulted in a hung jury.  In the event the jury's verdict was greater than $750,000, Mrs. Behurst was to receive the jury verdict up to a maximum of $3,000,000.

2 - FINDINGS OF FACT & CONCLUSIONS OF LAW

Lynne Hall ("Hall").[2]  The Wrongful Death Action was initially filed in Multnomah County Circuit Court, and was removed to the United States District Court for the District of Oregon on September 8, 2004.  The Wrongful Death Action is based on diversity jurisdiction pursuant to 28 U.S.C. § 1332 and was initially assigned to the Honorably Ancer L. Haggerty.

The Wrongful Death Action went to trial on October 19, 2009, lasting for nine days. During the course of trial, on October 28, 2009, Crown Cork and the Behursts signed the Settlement Agreement.  The Behursts, however, have refused to perform their obligations under the agreement.  In response to the Behursts' refusal to perform under the terms of the Settlement Agreement, Plaintiff filed this action–the Settlement Agreement Action.[3]  In the Settlement Agreement Action, Defendants make the following assertions: (1) Mr. Behurst is not a proper party in the Settlement Agreement Action and thus all claims stated against him must be dismissed; (2) no contract exists because there was no mutual assent between the parties and because there was a mutual mistake of fact; (3) if a contract does exist, the Behursts are entitled to a rescission of the contract because it was premised on a mutual mistake of fact, namely the contracting parties were mistaken that the Behursts' then-attorney, Mark Morrell ("Morrell"), was authorized to negotiate and enter into a settlement agreement on behalf of Mrs. Behurst; (4) the Settlement Agreement is rescindable because the Behursts signed the agreement under duress and

---

[2] Mrs. Behurst filed the Wrongful Death Action as personal representative of the Estate of Hall (the "Estate").  Mr. Behurst was not a named plaintiff in the Wrongful Death Action.

[3] The Settlement Agreement Action was initially assigned to the Honorable Garr M. King. In light of the pending proceeding before Judge King, on March 26, 2010, Judge Haggerty ordered a temporary stay of the Wrongful Death Action.  The Settlement Agreement Action and Wrongful Death Action were subsequently reassigned to me on February 17, 2011, and June 15, 2011, respectively.

3 - FINDINGS OF FACT & CONCLUSIONS OF LAW

undue influence and because Mrs. Behurst's signature was not notarized; and (5) Plaintiff is not entitled to specific performance of the Settlement Agreement because Plaintiff has not yet tendered payment of any settlement monies as required under the Settlement Agreement.

The parties agreed to try the matter to the court, and a bench trial was held on December 12, 13, and 21, 2011. Having considered the proposed findings of fact submitted by the parties, having weighed all the evidence, and having assessed the credibility of the witnesses, I make the following findings of fact and conclusions of law as required under Rule 52(a) of the Federal Rules of Civil Procedure and find in favor of Plaintiff.

## FINDINGS OF FACT

Hall was Defendants' daughter. While working at Crown Cork on August 12, 2002, she was killed by one of Crown Cork's machines. After Hall died, Mrs. Behurst established herself as the personal representative of the Estate of Tara Lynn Hall (the "Estate"), retaining the counsel of Scott Pratt ("Pratt") as her probate attorney.[4] On August 28, 2002, the Behursts retained Morrell as their attorney.[5]

In 2003 Ronald N. Turco, M.D. ("Dr. Turco") began treating Mr. Behurst and diagnosed him with Post Traumatic Stress Disorder ("PTSD"). Mr. Behurst retained the counsel of Nelson Hall ("Mr. Hall") to represent him in his workers' compensation claim against Crown Cork and ultimately secured a permanent and total disability claim against Crown Cork.

---

[4] Pratt and Morrell share an office space together and are close friends.

[5] Mr. Behurst was very involved in the Wrongful Death Action. He testified that he visited Morrell's office two to three times per week on a continuing basis, bringing witnesses, documents, and anything else he felt would help the case against Crown Cork.

With respect to Mrs. Behurst, it is undisputed that she was physically abused as a child by family members. Dr. Turco testified as an expert witness during the Settlement Agreement Action, opining that Mrs. Behurst suffers from PTSD, panic, and agoraphobia. He testified that a triggering event for Mrs. Behurst's panic is the mere mention of settling the Wrongful Death Action. Dr. Turco, however, also testified that he has never seen Mrs. Behurst as a patient, has never treated Mrs. Behurst, has never conducted an independent medical examination or psychiatric evaluation of Mrs. Behurst, and has never reviewed any of Mrs. Behurst's past medical records.

Jerry K. Larsen, M.D. ("Dr. Larsen") also testified as an expert witness in the Settlement Agreement Action. Contrary to Dr. Turco's testimony, Dr. Larsen testified that based on his review of the records, including the Behursts' deposition statements, Dr. Turco's deposition statements, legal documents, and various e-mails, it was not possible to diagnosis Mrs. Behurst with PTSD.

A little over one year after the Wrongful Death Action was filed, a mediation was held on February 8, 2006, but the parties were unable to reach an agreement. On July 30, 2007, a settlement conference was held before the Honorable Chief District Judge Ann L. Aiken, but the parties were again unable to reach an agreement. The Behursts testified that they have never wanted to settle the Wrongful Death Action.

Shortly before the Wrongful Death Action went to trial, October 14, 2009, Morrell sent a letter to Plaintiff's attorney, Vicki L. Smith ("Smith"), offering $3 million to settle the Wrongful Death Action. Mrs. Behurst testified she did not authorize Morrell to make such an offer. In response to the offer, Smith sent a letter dated October 16, 2009, to Morrell stating Crown Cork

was willing to settle the Wrongful Death Action for $750,000. Crown Cork later offered the sum of $1 million to settle the case. Morrell, however, testified he did not send Mrs. Behurst an e-mail or letter asking her whether she wanted to accept or decline the $750,000 offer, and Mr. Behurst testified Morrell did not notify him about the $1 million settlement offer by Crown Cork.

The Wrongful Death Action went to trial on October 19, 2009. A few days into trial, on October 21, 2009, Steve Piucci ("Piucci"), one of Morrell's good friends, sent an email to Morrell offering editing and consulting assistance in drafting Morrell's closing arguments.[6] Piucci testified that his offer to assist Morrell was not unusual and that he asks for legal assistance from others all the time.

On October 22, 2009, Mrs. Behurst heard Dr. Turco testify about her agoraphobia, and became upset.[7] She was found sobbing on the floor of the women's restroom located outside Judge Haggerty's courtroom (the "Courtroom") after Dr. Turco's testimony. Morrell and Dr. Turco both assisted Mrs. Behurst while she was in the restroom sobbing. Mrs. Behurst testified that while she was in the restroom, Morrell squeezed her arm and threatened to have someone else appointed as personal representative of the Estate. Dr. Turco, however, testified that while he was in the bathroom with Mrs. Behurst and Morrell, he witnessed no action by Morrell causing him any concern. In fact, he testified Morrell comforted Mrs. Behurst, spoke to her in a soft voice, and offered comforting touches on her arm. He specifically testified that Morrell did

---

[6] In addition to being a good friend of Morrell, Piucci is also a good friend of Mr. Hall. Piucci and Mr. Hall were associates at the same law firm, Pozzi, Wilson, Atchison, O'Leary & Conboy, in the 1980s and 1990s and have been friends ever since.

[7] Dr. Turco was only present at the Mark O. Hatfield United States Courthouse (the "Courthouse") on October 22, 2009.

not threaten Mrs. Behurst in any way or threaten to remove her as personal representative of the Estate.

Dr. Turco described Mrs. Behurst as being in a panic "fugue state" when he and Morrel found her crying in the restroom on October 22, 2009. He characterized the fugue state as a state in which a person is in such panic that the person internalizes all her thinking and emotions to the point where no one else exists and where the person is completely unaware of what is going on. He testified that in his opinion Mrs. Behurst could not have knowingly signed an important legal document at any time during the trial of the Wrongful Death Action and that in his opinion Mrs. Behurst even lacked the judgment to buy a used car.

Dr. Turco, however, also testified that he was not at the Courthouse on October 28, 2009, let alone in the small room situated near the entrance of the Courtroom ("the Anteroom") where the Behursts signed the Settlement Agreement. Dr. Turco further testified that Mrs. Behurst was capable of acting as personal representative of the Estate, that Mrs. Behurst had periods when she was lucid, and that both Mr. and Mrs. Behurst were capable of handling their own day-to-day affairs.

On October 25, 2009, Smith sent Morrell an email expressing her interest in having the punitive damages claim against Crown Cork withdrawn, a claim that was important to the Behursts. A couple of days later, on October 27, 2009, Piucci met with Robert Maloney, Jr. ("Maloney"), a shareholder at the Lane Powell law firm, to discuss the terms of a possible settlement agreement. Subsequent to the meeting, Piucci sent Lane Powell an invoice for the time during which he and Maloney met and Lane Powell paid the invoice sent by Piucci.

7 - FINDINGS OF FACT & CONCLUSIONS OF LAW

During trial on October 27, 2009, in the foyer in front of the Courtroom, Mr. Hall introduced Mr. Behurst to Piucci, specifically mentioning the words "mediation" and "settlement" in his introduction.  Mr. Behurst's reaction to Piucci was so emotional that Piucci thought Mr. Behurst was going to hit him and he immediately left the Courthouse.  Piucci testified that at that time he did not think the Wrongful Death Action was going to settle.

After Mr. Behurst's emotional response to Piucci, Mr. Hall and Mr. Behurst sat together, side-by-side, for approximately thirty minutes on a bench in the foyer.  Their conversation touched upon a number of subjects, including how the trial was going, what witnesses had been called to testify, and the general nature of high-low agreements.  Towards the end of their conversation, Mr. Hall asked Mr. Behurst his thoughts on high-low agreements and Mr. Behurst responded something to the effect that it was Mrs. Behurst's decision.

After trial ended that day, October 27, 2009, Morrell, Mr. Hall, and the Behursts had a conversation near a pillar outside of the Courthouse.  Mrs. Behurst testified that during that conversation, Morrell was in Mr. Behurst's face yelling and pointing his finger at Mr. Behurst.  Morrell, however, described a different situation.  He testified he did not do anything threatening, angry, or violent during that conversion.  Likewise, Mr. Hall testified Mrs. Behurst's account of what happened during that conversation did not in fact occur.

The next morning, October 28, 2009, at 5:41 a.m., Piucci sent an email to Morrell stating that he had been unsuccessful in sitting down with the Behursts.  Despite Piucci's email, Maloney drafted the Settlement Agreement and sent it over to the Courthouse with Parna A. Mehrbani ("Mehrbani") along with a copy of a case which stated that the Probate Court needed to approve the Settlement Agreement (the "Probate Case").

8 - FINDINGS OF FACT & CONCLUSIONS OF LAW

Pursuant to the terms of the Settlement Agreement, Mr. Behurst was required to keep and maintain the confidentiality of the terms and existence of the Settlement Agreement and was precluded from mentioning anything about the Settlement Agreement to the jury. In exchange for, among other things, Mr. Behurst's promise to maintain confidentiality about the terms and existence of the Settlement Agreement, Crown Cork promised to pay Mr. Behurst's wife certain sums of monies depending on the outcome reached by the jury. At some time before 8:56 a.m., October 28, 2009, Mehrbani handed Morrell the Settlement Agreement and a copy of the Probate Case.[8]

Approximately four minutes before 9:00 a.m., October 28, 2009, Morrell met with Mrs. Behurst outside the Courtroom. Mrs. Behurst testified that Morrell touched her arm and told her that he wanted her to follow him into the Anteroom. Mrs. Behurst testified that when Morrell touched her arm she felt "panicky." She further testified that although she did not initially follow Morrell into the Anteroom, she eventually entered the Anteroom and sat down at a table next to her husband across from Morrell. According to the Behursts, they slid a letter across the table to Morrell after they were all seated at the table.[9] The Behursts testified Morrell did not read the letter at that moment.

_____

[8] At 9:01 a.m., October 28, 2009, Maloney sent an email to Morrell and Smith notifying them that Mehrbani would be delivering the final draft of the Settlement Agreement and a copy of the Probate Case to the Courthouse.

[9] Mr. Behurst testified the letter had been prepared the night of October 27, 2009. The letter expressed Mr. Behurst's wish that Morrell and his "trial lawyer friends" could have been as "diligent, hard pressing [sic], demanding, persistent, argumentative, and angry when dealing with the other side as [they had been] . . . when trying to get [the Behursts] to settle . . . ." Crown Cork Trial Exs., Ex. 8A, p. Oregon State Bar ("OSB") 429.

The following events that unfolded in the Anteroom are highly in dispute and are at the center of this litigation.  Morrell testified that he talked about each and every aspect and term of the Settlement Agreement with the Behursts, read each paragraph out loud, and explained how each part worked and what the legal terms meant.  He testified that he discussed the Settlement Agreement with the Behursts for approximately fifteen to eighteen minutes while in the Anteroom, did not raise his voice during that time, and only stood for approximately thirty seconds when talking to them.  Morrell further testified that before the Behursts signed the Settlement Agreement, he told them to look him in the eye and tell him they were agreeing to the terms of the Settlement Agreement.  He recounted that Mr. and Mrs. Behurst each looked him in the eye and expressed they understood what was going on and agreed to the terms in the Settlement Agreement.

The Behursts described a drastically different picture of what took place in the Anteroom the morning of October 28, 2009.  They testified that Morell did not read the Settlement Agreement to them and that they themselves did not read the agreement before signing it.  In fact, the Behursts testified they do not even remember signing the Settlement Agreement.

Mrs. Behurst testified the Behursts did not meet with Morrell in the Anteroom for very long.  She further testified that she was terrified during their meeting. She described Morrell as being very unfriendly, angry, forceful, hostile, shaky, abusive, and violent.[10]  She remembers Morrell talking during their meeting, but testified she was not listening to him.  She further

_____

[10]  In a letter addressed to the OSB, Judge Haggerty stated one of his law clerks had observed Morrell in the Anteroom gesturing and speaking heatedly to Mr. and Mrs. Behurst.

10 - FINDINGS OF FACT & CONCLUSIONS OF LAW

testified that at one point Morrell started banging on the table and completely lost control, jumping out of his chair and waiving his hands around.

Mr. Behurst testified that he had a lot of anxiety during the meeting in the Anteroom with Morrell on October 28, 2009.  He testified that he had completely shut down during the meeting and does not even remember talking about the Settlement Agreement or signing it.  He, however, remembers Morrell jumping up out of his chair, waving his arms, and going to the door to receive a document, which he now surmises must have been the Settlement Agreement.  He also remembers Morrell talking the whole time during the meeting, but recounts he did not hear what Morrell was saying.

The accounts of what took place inside the Anteroom the morning of October 28, 2009, are clearly in dispute. Having considered and weighed all the evidence presented at trial, I find that Morrell reviewed the contents of the Settlement Agreement with the Behursts.  I also find that the Behursts understood what they were signing when they attached their signatures to the Settlement Agreement the morning of October 28, 2009.  What is also clear is that before the jury had been instructed the same day, October 28, 2009, Mr. Behurst and Morrell acknowledged their signatures on the Settlement Agreement before a notary public, Janice Pinkley.

After the Behursts signed the Settlement Agreement, Morrell handed it to Crown Cork for its signature.  Subsequent to the Behursts' signing the Settlement Agreement, Morrell also called Piucci for assistance in having the signed Settlement Agreement approved by the Multnomah County Probate Court ("Probate Court") because Mrs. Behurst's probate attorney, Pratt, was out-of-state on vacation in Hawaii.  Piucci, however, was unable to assist Morrell because he had an arbitration matter to which he had to attend.  Consequently, Piucci called Mr. Hall to see if he

11 - FINDINGS OF FACT & CONCLUSIONS OF LAW

was available to assist Morrell.  After learning that the Behursts had signed the Settlement Agreement, that the Settlement Agreement required probate court approval before 4:00 p.m. that same day, October 28, 2009, that Morrell was unavailable because he was preparing to deliver his closing arguments in the Wrongful Death Action, that Pratt was out-of-state on vacation, and that Piucci was unavailable, Mr. Hall volunteered his assistance in getting the Probate Court's approval of the Settlement Agreement.

Having decided to assist Morrell in obtaining the Probate Court's approval of the Settlement Agreement, Mr. Hall sought a copy of the signed agreement, which by that time had already been delivered to Lane Powell's downtown Portland, Oregon, office.  After arriving at Lane Powell around 10:00 to 10:30 a.m., October 28, 2009, Mr. Hall was placed in one of Lane Powell's conference rooms.  Mr. Hall was also put in contact with Pratt via telephone.  Over the telephone, Mr. Hall read Pratt the Settlement Agreement word for word.  Pratt "associated" Mr. Hall over the phone and gave Mr. Hall approval to prepare the probate documents and to obtain probate court approval.[11]  Pratt also instructed Mr. Hall to explicitly state in an affidavit that Pratt had approved the Settlement Agreement.

Mr. Hall drafted the necessary documents for the Probate Court at Lane Powell's office, and Maloney made forms related to probate court approval available to Mr. Hall in the event he needed them.  Mr. Hall did not recall using any templates proffered by Lane Powell, but did recall receiving a copy of the local rules addressing the requirements for the probate court petition and the supporting affidavit.  He also testified Lane Powell's staff typed up what he had written.

---

[11] Pratt testified he did not contact Mrs. Behurst about "associating" Mr. Hall.

12 - FINDINGS OF FACT & CONCLUSIONS OF LAW

Mr. Hall ultimately drafted: (1) the Petition for Order Authorizing, Approving and Ratifying high-Low Damages Agreement and Retention of Co-Counsel ("Petition"); (2) the Affidavit of Nelson R. Hall ("Affidavit"); and (3) Order Authorizing, Approving and Ratifying High-Low Damages Agreement and Retention of Co-Counsel ("Order").  Around 1:30 p.m., October 28, 2009, Mr. Hall and Maloney took the Petition, the Affidavit, and the Order to the Probate Court.  The Honorable Katherine Tennyson signed the Order before closing arguments finished in the Wrongful Death Action on October 28, 2009.

Sometime after 5:00 p.m., October 28, 2009, Defendants left voicemail messages with Judge Haggerty's chamber staff.  One of their voicemails requested the court's assistance in repudiating the Settlement Agreement.  At 5:35 p.m., October 28, 2009, Mr. Behurst sent an email to Morrell requesting that he and his wife be allowed to withdraw from the Settlement Agreement because they did not read it, did not receive a copy of the Settlement Agreement, and Mrs. Behurst's signature had not been notarized.  That same evening, October 28, 2009, the Behursts also called a legal assistant at an unspecified law firm who Mr. Behurst testified supplied them with the term "undue influence."  Subsequent to speaking with the legal assistant, Mr. Behurst drafted a letter to Judge Haggerty.  The language of the letter was exactly the same as Mr. Behurst's 5:35 p.m., October 28, 2009, email to Morrell with the exception that it included the following sentence: "Again you exerted undue influence in order to get us to sign."

The next day, October 29, 2009, Judge Haggerty wrote a letter to the OSB "out of concern for the [Defendants], whether [Defendants were] being fairly represented, and how to respond appropriately to [Defendants'] communications and the allegations regarding Mr. Morrell."  The following day, October 30, 2009, the Behursts sent Judge Haggerty several more letters, one of

13 - FINDINGS OF FACT & CONCLUSIONS OF LAW

which reemphasized their desire to rescind the Settlement Agreement.    That same day, October

30, 2009, Morrell moved to withdraw himself as counsel for the Behursts.  Because the jury had

already received jury instructions and was in the midst of deliberations, Judge Haggerty denied

Morrell's motion.

Ultimately, the jury could not reach a verdict, and Judge Haggerty declared a mistrial on

October 30, 2009.  The same day, October 30, 2009, Morrell's motion to withdraw as Mrs.

Behurst's counsel was granted.[12]  On February 17, 2010, Daniel J. Snyder ("Snyder") appeared on

behalf of Mrs. Behurst.  He notified Plaintiff that the Settlement Agreement was null and void

and demanded that the Settlement Agreement be rescinded.

## CONCLUSIONS OF LAW

### I. Oregon Law Governs

A federal district court sitting in diversity must apply the substantive law of the forum

state.  E.g., Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 426-27 (1996); Erickson v.

Desert Palace, Inc., 942 F.2d 694, 695 (9th Cir. 1991) (citing Erie R.R. v. Tompkins, 304 U.S. 64

(1938)); CRST Van Expedited, Inc., v. Werner Enter., Inc., 479 F.3d 1099, 1111 (9th Cir. 2007)

("[F]ederal courts sitting in diversity . . . apply state substantive law and federal procedural

law."); McCarthy v. State Farm Fire and Cas. Co., No. CV-10-334-ST, 2010 WL 3938294, at *4

(D. Or. 2010) (A "court must apply the substantive law of Oregon" in resolving a dispute

"premised on diversity of citizenship") (citation omitted).  "The construction and enforcement of

settlement agreements are governed by principles of local law which apply to interpretation of

---

[12] On May 31, 2011, Judge Haggerty entered a final judgment dismissing all claims
against Ameco.

contracts generally." <u>United Commercial Ins. Serv., Inc. v. Paymaster Corp.</u>, 962 F.2d 853, 856 (9th. Cir. 1992).

Because this court is sitting in diversity, Oregon law determines whether the Settlement Agreement in this instance is valid and enforceable. <u>E.g.</u>, <u>Farina v. Mt. Bachelor, Inc.</u>, 66 F.3d 233, 235 (9th Cir. 1995) ("In this diversity action [involving whether a release clause is enforceable], we are bound by applicable Oregon law."); <u>Int'l Mktg. Ltd. v. Archer Daniels Midland Co.</u>, No. 97-1328-AS, 1998 WL 1180157, at *2 (D. Or. 1998) (applying Oregon law to determine whether oral contracts were valid and enforceable).  Accordingly, this court will apply Oregon state law to resolve the claims at issue here.

## II. Mr. Behurst is a Proper Party To This Action

Mr. Behurst is a proper party to this action.  "One is a party to an agreement not only by promising to do certain things but also by being the recipient of another's obligation to perform." <u>H.N.M. Enter., Inc. v. Hamilton</u>, 49 Or. App. 613, 623 (1980).  "As soon as a party to a contract breaks any promise he has made, he is liable to an action." <u>Vega v. Farmers Ins. Co. of Or.</u>, 323 Or. 291, 296 (1996) (citation omitted).  Here, Mr. Behurst understood the contents of the Settlement Agreement and signed it.  As a contracting party to the Settlement Agreement who promised to perform certain obligations in exchange for remuneration of monies to his wife, Mr. Behurst is a proper party to this litigation.

## III. A Binding Contract Exists

I turn next to the issue of whether a binding contract exists between the Behursts and Crown Cork.  The existence of a contract is a question of law. <u>E.g.</u>, <u>Dalton v. Robert Jahn Corp.</u>, 209 Or. App. 120, 132 (2006) (citing <u>Ken Hood Constr. Co. v. Pac. Coast Constr., Inc.</u>, 201 Or.

App. 568, 577 (2005)).  Oregon applies an "objective" theory of contracts.  Ken Hood Constr. Co., 201 Or. App. at 578 (citing Kabil Dev. Corp. v. Mignot, 279 Or. 151, 156 (1977)).  When determining whether a contract exists, a court examines "the parties' objective manifestations of intent, measured by whether a reasonable person would construe a promise from the words and acts of the other."  Wooton v. Viking Distrib. Co., Inc., 136 Or. App. 56, 59 (1995) (citing Real Estate Loan Fund v. Hevner, 76 Or. App. 349, 354 (1985)).  Oregon courts "examine the parties' objective manifestations of intent, as evidenced by their communications and acts" when determining whether a contract exists.  Ken Hood Constr. Co., 201 Or. App. at 578 (citing Kabil, 279 Or. at 157-58); VTech Commc'ns, Inc. v. Robert Half, Inc., 190 Or. App. 81, 86 (2003) ("Mutual assent, or what historically was considered as the 'meeting of the minds' requirement, may be expressed in words or inferred from the actions of the parties.").  "Contract formation requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration."  Ken Hood Constr. Co., 201 Or. App. at 577 (internal quotation marks and citation omitted).

"[M]anifestation of mutual assent to an exchange ordinarily takes the form of an offer or proposal by one party followed by an acceptance by the other party or parties."  Id. at 578 (citation omitted).  A "manifestation of acceptance to the offeror or his agent forms the contract regardless of the intent of the acceptor."  Id. (citing Hevner, 76 Or. App. at 355).  "Anything that amounts to a manifestation of a formed determination to accept the offer, communicated to the party making such offer completes the contract."  Ken Hood Constr., 201 Or. App. at 579 (citation and quotation marks omitted).  The party asserting the existence of a contract has the burden of establishing its existence and terms.  Bernard v.Vatheuer, 303 Or. 410, 412 (1987);

Holdner v. Holdner, 176 Or. App. 111, 120 (2001) (under Oregon law, the party attempting to establish the contract must establish that an enforceable agreement exists).

Here, the Behursts' act of signing the Settlement Agreement with their attorney present, despite their actions before and after signing the contract, amounts to manifestation of a mutual assent to establish a binding contract. "The law of contracts is not concerned with the parties' undisclosed intents [and] ideas. It gives heed only to their communications and overt acts." Kitzke v. Turnidge, 209 Or. 563, 573 (1957). "Whether parties enter into a contract does not depend on their uncommunicated subjective understanding; rather, it depends on whether the parties manifest assent to the same express terms." Dalton, 209 Or. App. at 132 (citing Newton/Boldt v. Newton, 192 Or. App. 386, 392 (2004)); Wooton, 136 Or. App. at 59 (mutual intent can be demonstrated through writing of parties); Aloha Dog and Cat Hosp., P.C. v. Standard Ret. Serv., Inc., No. CV 08-927-PK, 2010 WL 5232950, at *6 (D. Or. 2010) ("Because the parties signed an agreement . . . there is no dispute as to that agreement's existence or to its terms.").

Based on the foregoing reasons, I conclude that a contract exists between the Behursts and Crown Cork.

## IV. Rescission

### A. Mutual Mistake of Fact Regarding Morrell's Authority

I also conclude there was no mutual mistake of fact as to whether Morrell was authorized to negotiate and enter into the Settlement Agreement on behalf of the Behursts. "A mutual mistake of fact renders a contract voidable by the adversely affected party, where the parties are mistaken as to the facts existing at the time of the contract, if the mistake is so fundamental that

17 - FINDINGS OF FACT & CONCLUSIONS OF LAW

it frustrates the purpose of the contract, and where the adversely affected party does not bear the risk of the mistake." E.g., Lesher v. Strid, 165 Or. App. at 42 (internal quotation marks and citations omitted). A mistake "is a state of mind which is not in accord with the facts." Ellison v. Watson, 53 Or. App. 923, 927 (1981). A party seeking rescission based on mutual mistake must "declare its intent to rescind promptly after discovering the grounds for rescission." Venture Prop., Inc. v. Parker, 223 Or. App. 321, 349 (2008) (citing Snyder v. Rhoads, 47 Or. App. 545, 554 (1980)). "Grounds for rescission on the basis of a mutual mistake of fact . . . must be proved by clear and convincing evidence." Lesher v. Strid, 165 Or. App. 34, 41 (2000) (citations omitted); Generaux v. Dobyns, 205 Or. App. 183, 194-95 (2006) ("To obtain rescission of an instrument for mistake, a plaintiff must establish by clear and convincing evidence that he or she made a mistake that was so fundamental that it frustrated the purpose of the instrument, and the mistake must have existed when the instrument was created.").

As noted above, I find that Morrell explained the contents of the Settlement Agreement to the Behursts and that the Berhursts understood the contents of the Settlement Agreement when they signed it. The evidence before me clearly demonstrates there was no mistake as to the facts existing at the time the Behursts and Crown Cork signed the contract. Accordingly, the Settlement Agreement may not be rescinded on the Behursts' theory of mutual mistake of fact.[13]

---

[13] Although the Behursts failed to raise the argument in their trial memorandum, they asserted during their closing arguments that because there was a mutual mistake of fact between the contracting parties, no contract even existed between them and Crown Cork. As noted a number of times above, I find that the Behursts were well aware of the contents of the Settlement Agreement when they signed it. Accordingly, there was no mutual mistake of fact negating the existence of the Settlement Agreement.

18 - FINDINGS OF FACT & CONCLUSIONS OF LAW

**B. Undue Influence and Duress**

With respect to undue influence[14] the Oregon Court of Appeals has previously stated:

> Undue influence has been defined as unfair persuasion of a party who is under the domination of the person exercising the persuasion or who by virtue of the relation between them is justified in assuming that that person will not act in a manner inconsistent with his welfare. When undue influence is exerted by one party to a contract on the other party and that influence induces assent, the contract is voidable by the victim of the influence. Moreover, when there is a confidential relationship between the parties, only slight evidence is necessary to establish undue influence. Finally, when there is a confidential relationship coupled with suspicious circumstances, an inference of undue influence arises. That inference may be sufficient to establish undue influence.

Smith v. Ellison, 171 Or. App. 289, 293-94 (2000) (internal quotation marks and citations omitted).

With respect to duress, Oregon has also long recognized that contracts entered under duress are not binding. See, e.g., Or. Bank v. Nautilus Crane & Equip. Corp., 68 Or. App. 131, 142 (1984). "Duress is an unlawful constraint exercised on a person whereby he [or she] is forced to do some act against his [or her] will." Id. (citation omitted); Horn v. Davis, 70 Or. 498, 505 (1914) (same). Regarding economic duress, Defendants must establish: "(1) wrongful acts or threats; (2) financial distress caused by the wrongful acts or threats, and (3) the absence of any reasonable alternative to the terms presented by the wrongdoer." Kreidler v. Taylor, 473 F. Supp. 2d 1090, 1096 (D. Or. 2007) (quoting Nautilus Crane & Equip. Corp., 68 Or. App. at 142). "Whether particular facts amount to duress is a question of law, but the underlying facts, including whether the party claiming duress acted as a reasonably prudent person in choosing the

---

[14] In their closing arguments, the Behursts expressly stated the Settlement Agreement must be rescinded based on undue influence. They, however, failed to raise this argument in their trial memorandum, and in fact, failed to even mention the term "undue influence" in their trial memorandum.

alternative that was chosen, are for the jury to decide." Comcast of Or. II, Inc. v. City of Eugene, 211 Or. App. 573, 586 (2007) (citation omitted).

Morrell's actions in this instance, including his grabbing of Mrs. Behurst's arm before entering the Anteroom and his gesturing and jumping out of his chair while in the Anteroom, even if assumed to be true, are insufficient to establish undue influence or duress. See Smith v. Ellison, 171 Or. App. at 293-94; Nautilus Crane & Equip. Corp., 68 Or. App. at 142. Similarly, any pressure exerted on the Behursts resulting from having to obtain probate court approval before 4:00 p.m. on October 28, 2009, does not amount to undue influence or duress warranting rescission of the Settlement Agreement under these circumstances.

In addition, it is noteworthy, but not dispositive, that the Behursts do not cite any authority expressly stating that parties to a contract may be subject to undue influence or duress by their own attorney. Suffice it to say, I find no Oregon law, and the Behursts fail to cite any, supporting the Behursts' novel theory.

The Settlement Agreement may also not be rescinded based on economic duress. There is no evidence even remotely establishing that Morrell's conduct caused the Behursts financial distress or that Morrell's conduct resulted in an "absence of any reasonable alternative to the terms presented." Kreidler v. Taylor, 473 F. Supp. 2d at 1096 (quotation omitted).

In short, the Settlement Agreement is not rescindable under the Behursts' theories of undue influence or duress.

**C. Failure to Notarize and Failure to Read the Settlement Agreement**

To the extent Defendants argue the Settlement Agreement is unenforceable because Mrs. Behurst's signature was not notarized, such argument fails. Here, Morrell reviewed the contents

20 - FINDINGS OF FACT & CONCLUSIONS OF LAW

of the Settlement Agreement with the Behursts and both Mr. and Mrs. Behurst understood the

contents of the Settlement Agreement when they signed it.  I find no authority in Oregon standing

for the proposition that under these circumstances the Settlement Agreement is unenforceable

simply because Mrs. Behurst did not have her signature notarized.

## V. Specific Performance

In Oregon, "[t]o be entitled to specific performance, a contract must be definite in all

material respects, with nothing left for future negotiation.  The foregoing is subject to an

exception that . . . [i]f there is sufficient intent expressed to make a legally valid contract, a court

of equity can make certain by its decree, within limits, subordinate details of performance which

the contract itself does not state." Kaiser Found. Health Plan of the Nw. v. Doe, 136 Or. App.

566, 574 (1995) (internal citations and quotation marks omitted).  "[U]nless [the] terms are so

indefinite that a court cannot determine what the parties intended, they form a contract that is

binding." Logan v. D.W. Sivers Co., 343 Or. 339, 347 (2007) (citation omitted).

The Behursts do not argue or present any evidence showing that the terms of the

Settlement Agreement here is insufficiently definite in all material respects.  Moreover, it is

undisputed the Behursts unequivocally repudiated the Settlement Agreement and have clearly

communicated their intentions to not perform their obligations under the Settlement Agreement.

"[T]he rule in Oregon excuses tender of performance if one party has repudiated the contract."

Aurora Aviation, Inc. v. AAR W. Skyways, Inc., 75 Or. App. 598, 634 (1985).  "A party

repudiates a contract when its conduct evinces a fixed purpose not to perform the contract."

Butler Block, LLC v. Tri-Cnty Metro. Transp. Dist. of Or., 242 Or. App. 395, 410 (2011).

Defendants' repudiation of the Settlement Agreement excused Crown Cork's obligation to tender

21 - FINDINGS OF FACT & CONCLUSIONS OF LAW

further performance under the Settlement Agreement, including its obligation to tender any

settlement monies to the Behursts.  Crown Cork's nonperformance in response to the Behursts'

repudiation of the Settlement Agreement does not preclude it from seeking specific performance

of the Settlement Agreement.

### CONCLUSION

Based on the foregoing reasons, my verdict is as follows: (1) the Settlement Agreement is

a valid and enforceable contract between the Behursts and Crown Cork; (2) the Behursts are

obligated to comply with all their obligations set forth under the Settlement Agreement; and (3)

the Behursts breached the Settlement Agreement by refusing to perform all their obligations

pursuant to the Settlement Agreement.

IT IS SO ORDERED.

Dated this 12th day of January, 2012.

/s/ Marco A. Hernandez
MARCO A. HERNANDEZ
United States District Judge